FILED
AUG 2 2 2007
8-22-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
NB

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TAVARES HAMILTON,
CELYNTHIA SMITH, and
MARY HAMILTON,
Plaintiffs,

-vs-

07CV 4743
JUDGE CASTILLO
MAGISTRATE JUDGE DENLOW

CHICAGO POLICE OFFICERS;
FRANK VILLAREAL (Star #10438),
DONOVAN MARKIEWICZ (Star #17092),
STEVE DEL BOSQUE (Star #15332)
PHILLIP CLINE, former
Chicago Police Department Supt.,
TISA MORRIS, former Chief Admin. of OPS,
DEBRA KIRBY, head of IAD, in their
individual capacities,
and the CITY OF CHICAGO,
Defendants.

## CIVIL COMPLAINT

**NOW COMES** the plaintiffs, TAVARES HAMILTON, CELYNTHIA SMITH, and MARY HAMILTON by and through their attorneys, THE CIVIL RIGHTS LITIGATION GROUP, complaining of the Defendants, Chicago Police Officers FRANK VILLAREAL (Star #10438), DONOVAN MARKIEWICZ (Star #17092), STEVE DEL BOSQUE (Star #15332), PHILLIP CLINE (former superintendent of Chicago Police Department), TISA MORRIS (former chief administrator of the Office of Professional Standards, DEBRA KIRBY (Head of the Internal Affairs Division), and the CITY OF CHICAGO, and states as follows:

## Introduction

1. This is a civil action seeking damages against defendants for committing acts under color of law, and depriving plaintiff of rights secured by the Constitution and laws of the United States. In sum, Plaintiff was unlawfully seized, falsely arrested and imprisoned, and maliciously prosecuted by the Defendants and has been harmed greatly by the unconstitutional conduct of the Defendants.

## Jurisdiction

2. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C., § 1983, the Judicial Code, 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States; and pendent jurisdiction for attendant state claims as provided under U.S.C., § 1367(a).

## The Parties

3. Plaintiff Tavares Hamilton resides at 1037 N. LeClaire Apt. 2, Chicago, Illinois, 60651.
4. Plaintiff Celynthia Smith resides at 1037 N. LeClaire Apt. 2, Chicago, Illinois, 60651.
5. Plaintiff Mary Hamilton resides at 39 N. Lotus Chicago, Illinois, 60644.
6. Defendant Officers were, at the time of this occurrence, employees of the Chicago Police Department and acted under their authority as duly appointed police officers in the Chicago Police Department at all relevant times.
7. Defendant Phillip Cline was the superintendent of the Chicago Police Department at the time of the complained of events. As superintendent Cline was responsible for the overall management of the Chicago Police Department, and at all times relevant

to this Complaint acted in the course and within the scope of his employment. Former Superintendent Cline is sued in his capacity.

8. Defendant Tisa Morris was the chief administrator of the Chicago Police Department's Office of Professional Standards ("OPS"), and at all times relevant to this Complaint, acted in the course and within the scope of her employment as such. Morris is sued in her individual capacity for her actions and omissions, by virtue of her authority as Chief Administrator of the OPS.

9. Defendant Debra Kirby presently serves as the head of the Chicago Police Department's Internal Affairs Division ("IAD"), and at all times relevant to this Complaint acted in the course and within the scope of her employment. Kirby is sued in her individual capacity for her actions and omissions, by virtue of her authority as head of IAD.

10. Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois, that operates the Chicago Police Department. The City Council is the final policy maker for the City of Chicago with regard to police policies and practices. The City Council has delegated to the Superintendent of Police authority and responsibility for the day to day operation of the Chicago Police Department. Defendant City of Chicago is ultimately responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby.

**Background Facts**

11. On May 17, 2006 at 8:30 p.m., Tavares Hamilton was at home playing with his children and waiting for dinner to be done when he left his home at 1037 N. Leclaire

to go to the A & B store on the corner of Division and LeClaire to buy some sodas for dinner.

12. Shortly after leaving, on foot, down LeClaire towards Division, Hamilton heard a car speeding up and turned around and saw a marked squad car turning down LeClaire, which is a one-way street, going the wrong way, towards him.

13. Then, the marked squad car stopped directly in front of him and three police officers, Frank Villareal, a Hispanic male, Steve Del Bosque also a Hispanic male, and Donovan Markiewicz, a Caucasian male, got out of the car and swarmed around Hamilton.

14. The officers grabbed him and slammed him into the fence in front of the house at 1113 N. Leclaire.

15. As the officers began to put handcuffs on Hamilton as he asked them, "What are you grabbing me for?"

16. One of the officers responded, "You know what you were doing," and they proceeded to search him and found the car keys belonging to Hamilton's girlfriend, Celynthia Smith, in his front pocket.

17. One of the officers used the alarm feature on the keys to locate Smith's car.

18. During this time, Hamilton had been put into the back of the squad car.

19. After the officers searched the car, which contained no drugs or anything else illegal, one of the officers drove away in Smith's car.

20. The other officers, who had Hamilton in the squad car, also followed the officer who was driving Smith's car.

21. By this time, one of the officers had taken Hamilton's identification, which had his previous address where he had previously lived with his mother and ran his information through the computer.

22. The officers also learned that Hamilton was on parole and learned his grandmother's address where he had been paroled to, 39 N. Lotus, which is also in Chicago.

23. The officer took Smith's car to his previous address, in the area of Menard and Division, to the home, which his mother had sold to new owners.

24. The officer knocked on the door of the previous address and told the new tenants, who did not even know Hamilton, that Hamilton had informed the Defendant Officer that he lived there and that there were drugs present in the residence and that they were going to search the residence.

25. The Defendant Officer who had taken Smith's car, then went to the home of Hamilton's grandmother, Plaintiff Mary Hamilton, at 39 N. Lotus in Chicago.

26. When Mary Hamilton answered the door, through a security chain on the door, the officer told her that her grandson Tavares Hamilton had told them that there were drugs present in the residence, and that he needed to search the residence, which was untrue.

27. When Mary Hamilton would not open her door so that they could enter the residence and search, the officer violently pushed the door into her and broke the chain on the door, overpowering her and forcibly entered the front hallway of the residence.

28. Hearing the commotion, Hamilton's grandfather came to the door, and the officer only ceased his forcible entry into the premises when Hamilton's grandfather,

Kenneth Smith, appeared demanding to see a warrant before allowing the Officer any further into the home.

29. After harassing and misleading the current owners at Hamilton's previous address as well as harassing, attempting to mislead and abusing his grandparents, the Defendant Officer driving Smith's car and the Defendant Officers who had Hamilton in the back of the squad car then drove to the 15th District station of the Chicago Police Department.

30. At the police station, Smith's car was completely stripped and searched and sent to the impound yard with severe damage caused by the Defendant Officers and a designation as a car involved in the sale of narcotics, even though the officers knew that was not true.

31. At this point, Tavares was taken inside the police station and processed.

32. Tavares was never told why he was being arrested by the officers and when he asked other officers at the station about it they responded that they would try to see what was going on and that they did not know these officers and that they thought that they were part of some kind of task force, which is now known to be the Special Operations Section ("SOS").

33. The watch commander noted in the arrest report that there were more than three hours after Hamilton was in custody before he was put into the system.

34. At the time when Defendant Officers encountered and seized the person of Tavares Hamilton, he had approximately $300.00 U.S. Currency in his pocket.

35. On the police arrest report completed by Defendant Frank Villareal, he lists that Hamilton had only $103.00 in U.S. Currency in his possession at the time of arrest.

36. Defendant Villareal subsequently testified at the preliminary hearing that Hamilton had $137.00 U.S. Currency in his possession at the time of arrest.

37. Tavares finally found out after he arrived the next day on May 18, 2006 at Cook County Jail that he was being arrested for allegedly selling drugs.

38. Hamilton was unable to receive a bond because, as he was completing the terms of a parole, this arrest would be considered a parole violation that warranted him being sent into the Illinois Department of Corrections.

39. On May 20, 2006, Hamilton was sent to Statesville Correctional Center in Joliet, Illinois, to await his preliminary hearing.

40. Hamilton remained at Statesville for approximately three months before he was transferred to Pontiac Correctional Facility, where he remained for approximately one month.

41. Both Statesville and Pontiac were under full lockdown during the time that Hamilton was there, and he was forced to remain locked in his cell 23 hours a day.

42. On June 12, 2006, at Tavares's preliminary hearing, Officer Villareal testified under oath that on May 17, 2006, he observed Tavares selling narcotics to an unknown male subject on two different occasions, during a fifteen minute period while Officer Villareal stood approximately 100 feet away, which was completely false.

43. Based solely on Officer Villareal's testimony, the court found that there was probable cause to charge Tavares with Possession with the intent to deliver narcotics.

44. The second court date was July 3, 2006, and the case was assigned to a trial judge, Hamilton was formally arraigned, representation from the Public Defender's office

was assigned to Hamilton, along with several other rudimentary pre-trial preliminary matters were handled.

45. Hamilton entered a plea of not guilty. The State had not recieved the requisite evidence to proceed and the parties obtained a continuance by agreement.

46. At this time, Hamilton remained in custody awaiting his next court date.

47. On the third court date on August 1, 2006, the case was continued due to the absence of both the judge and Officer Villareal and the State had still not obtained the requisite evidence to proceed in the case against Tavares Hamilton.

48. Hamilton remained in custody until his court date on August 25, 2006, the case was continued again due to the State still not having received the requisite evidence to proceed.

49. At the August 25, 2006 court date, Tavares went to court and demanded that his public defender request pictures of the area where he had been arrested, because they would prove that Officer Villareal was not telling the truth about his alleged observation of Hamilton selling drugs. The case was continued again.

50. Hamilton stayed in custody until his fifth court date, on September 20, 2006.

51. Tavares Hamilton remained incarcerated until approximately four weeks later, at the sixth court date, on September 20, 2006, the State's Attorney offered Hamilton a plea agreement of 3 years incarceration and 2 additional years of parole, and still had not received the requisite evidence to proceed against Hamilton.

52. Hamilton rejected the plea offer and demanded trial.

53. Tavares received a trial date of Oct 20, 2006, but he never got an opportunity to stand trial on that date.

54. On Oct 13, 2006, a week before Hamilton was scheduled to stand trial, he was transported to 26th and California and brought to court in front of the Honorable Judge Mary Margaret Brosnahan, the judge assigned to his case.

55. On this date, Judge Brosnahan informed Tavares Hamilton that the charges against him were being dismissed *nolle prosequi* due to the indictment of Frank Villarcal, whose testimony at the probable cause hearing would now be unreliable and lack credibility to further continue the charges.

56. At this point, Tavares was told that he would be transferred from Statesville, to Mount Sterling facility, for three weeks, until the Parole Board reconvened there and would have an opportunity to review his case and decide whether to issue him a violation.

57. On November 14, 2006, Mr. Hamilton, went in front of the Parole Board and they decided not to violate him.

58. Tavares was released from incarceration on that same day, with four months left to fully satisfy his parole.

59. Before getting arrested Tavares worked full-time for Washington Inventory Service at 1515 N. Harlem, Chicago, Illinois, for approximately one year making $10/hr. Tavares was fired due to his incarceration.

60. The vehicle of Ms. Celynthia Smith, Hamilton's fiancée, which was seized due to the false charges against Hamilton, was Hamilton's primary means of transportation for his employment.

61. After his incarceration, the only job Tavares was able to find was at I.P.G. in Buffalo Grove, Illinois, which was 30-40 miles away from his residence in Chicago.

62. Additionally, the I.P.G. job was part-time and paid only $6/hr.

63. Tavares had to leave the job at I.P.G. due to transportation issues deriving from the unlawful impound and the constructive repossession of Smith's vehicle.

64. Ms. Smith and Mr. Hamilton have to paid approximately $1200.00 in fines and fees related to the impoundment of Smith's car.

65. Smith currently remains without transportation and after paying a considerable fines and fees, was still unable to retrieve the car from the impound yard because of the lease agreement with Rogers Pontiac.

66. The reason given by Rogers Pontiac for not returning the car dealt with the destroyed condition of the car due to the unlawful search and seizure by the Defendant Officers and the fact that the charges of selling narcotics from the vehicle violated the lease agreement.

67. Presently Smith and Hamilton are continuing to pay for the car even though they no longer have the benefit of its use and Rogers Pontiac is currently garnishing Smith's wages for approximately $350.00 each month.

**The Culpability of the City of Chicago and Police Department Supervisors**

68. For at least four years, Defendant Officer Frank Villareal and other Chicago Police Officers within the "Special Operations Section" regularly committed criminal acts like those experienced by the Plaintiffs in this action.

69. Over that time period, Defendant Officer Villareal and other SOS officers regularly broke into civilians homes and businesses to commit armed theft, physical violence, planting drugs and guns, as well other serious crimes under the color of law.

70. In late 2006, the Cook County State's Attorney's Office brought criminal charges against Defendant Frank Villareal and seven other officers said to his partners in crime within the Department. The charges were brought, independent of the Chicago Police Department, only after Cook County prosecutors became suspicious about the SOS members' frequent failure to appear in criminal court to testify on charges resulting from arrests they had made.

71. As a result of Cook County's investigation, Defendant Villareal now faces up to 30 years in prison for the abuses he committed as a Chicago Police Officer.

72. For at least four years before the Special Operations Officers were indicted, the City knew about their criminality through voluminous citizen complaints and lawsuits brought against them. Against Defendant Frank Villareal alone, civilians have brought multiple lawsuits that the City has settled.

73. Despite this notice, the City did nothing to stop the officers' misconduct. If it were not for the efforts of Cook County, through its investigation, these officers would still be on the streets, free to terrorize the citizens of the City of Chicago, from behind the protection of a gun and a badge.

74. The City's inaction regarding the Special Operations officers' repeated conduct is just one example of the City's widespread failure to properly control its officers. The City of Chicago maintains a *de facto* policy, practice and custom of failing to train, supervise, discipline, and control its police officers.

75. Municipal policy-makers have long been aware of the City's policy, practice and custom of failing to properly train, supervise and discipline its police officers:

a. In 1999, the then Superintendent of Police gave a speech highlighting problems with the City of Chicago's policies and practices. Superintendent Hilliard spoke specifically of the need for early detection of potential problem officers, an effective disciplinary system, and officer accountability for misconduct.

b. In 2001, the Justice Coalition of Greater Chicago ("JCGC"), composed of more than a hundred community groups, concluded a study that the determined that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to Mayor Richard Daley, the police superintendent, and the Chicago Police Board.

c. In the 2002 arbitration for the police contract with the Fraternal Order of Police, the City recognized that it needed a way to identify officers who engage in repeated misconduct, stating that "the current system is flawed because 'not sustained' complaints cannot be considered in new investigations, even if they might suggest a pattern of inappropriate conduct."

d. In 2003, a federal jury in the case of Garcia v. City of Chicago, No. 01 C 8945, 2003 WL 22175618, at *2 (N.D.Ill. Sept. 19, 2003) affirmed that the City's police misconduct investigations were systematically "incomplete, inconsistent, delayed, and slanted in favor of the officers" and as a result, fostered a culture of impunity within the Chicago Police Department. The "City of Chicago's custom and practice of not adequately investigating,

disciplining, or prosecuting off-duty Chicago Police officers who use excessive force against individuals" was found to have directly caused the constitutional harm. Id. At *1.

e. By its own accounting, in 2004 the City of Chicago sustained civilians' allegations against officers in only 11 of 1,684 allegations of civil rights violations, less than 1 percent. A far smaller percentage of officers were actually disciplined for their misconduct. The Department's annual reports from 2001, 2002 and 2003 reveal similarly high numbers of civil rights complaints against its officers and similarly low rates of sustaining those complaints.

49. Although the City of Chicago has long been aware that its supervision, training and discipline of police officers is entirely inadequate, it has not enacted substantial measures to address these failures. Despite their knowledge of the inadequacy of the City's supervision, training, and discipline of Chicago Police officers, Defendants Morris and Kirby (the chiefs of the City's police investigatory agencies) and Defendant Cline have failed to reform the broken system in any meaningful way. Redress that was specifically promised by the City Council and the Superintendent has long gone unfulfilled.

50. the City has failed to institute an "early warning" system to identify and track patterns of abuse by individual officers or groups of officers. For instance, the City fails to consider prior complaints against officers to identify and respond to patterns of misconduct by its officers.

51. As a result of the City's policies, practices, and customs, its officers are emboldened to commit misconduct against civilians by their knowledge that they are effectively "above the law" and will not be held accountable for their misconduct.

52. The City not only failed to prevent the Special Operations Section from abusing civilians, but actually caused their conduct. Knowing of the City's poicies and practices, which allowed even the most repetitive abusers to go unmonitored and unpunished, the Defendant Officers had nothing to fear from the City when they abused the Plaintiffs in this instant complaint.

53. The then chairman of the Chicago City Council's Committee on Police and Fire declared in a January 2000 resolution, "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

**<u>COUNT I—Unlawful Seizure—Tavares Hamilton</u>**

76. Plaintiff realleges and reincorporates all previous paragraphs.

77. As described above, the Defendant Officers, acting under color of law, conducted an unconstitutional search and seizure of Tavares Hamilton.

78. More specifically, Defendant Officers stopped, searched and arrested Tavares Hamilton without probable cause, a warrant for his arrest, reasonable suspicion, or any true belief or indicia that he had committed any crime.

79. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights and innocence of Tavares Hamilton.

80. The misconduct described in this Count was caused and participated in by Defendants Cline, Morris and Kirby (Supervisory Defendants) in the manner described more fully above.

81. WHEREFORE, as a result of Defendant Officers' unconstitutional search and seizure, the City's policy and practice, and the Supervisory Defendants' actions and omissions, Plaintiff suffered emotional injuries including mental and emotional damage and trauma, humiliation, damage to his personal and professional reputation, loss of liberty, mental distress and anguish, , he requests actual and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate.

**COUNT II—Unlawful Search and Seizure—Mary Hamilton**

82. Plaintiff realleges and reincorporates all previous paragraphs.

83. As described above, the Defendant Officers, acting under color of law, illegally entered Plaintiff Mary Hamilton's home with force.

84. More specifically, Defendant Officers came to Mrs. Hamilton's front door and when she cooperated by answering her door and speaking with the Officer about why he was there, the Officer told a lie to her, trying to gain her consent for entry into the home.

85. When Mary Hamilton did not disengage the security chain on her door so that the Officer(s) could conduct a search without a warrant, with no legal basis whatsoever, the door was forced in, breaking the security chain, with her standing right behind the door.

86. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights, safety and innocence of Mary Hamilton.

87. The misconduct described in this Count was caused and participated in by Defendants Cline, Morris and Kirby (Supervisory Defendants) in the manner described more fully above.

88. WHEREFORE, as a result of Defendant Officers' unconstitutional search and seizure, the City's policy and practice, and the Supervisory Defendants' actions and omissions, Plaintiff suffered emotional injuries including mental and emotional damage and trauma, embarrassment and humiliation, damage to her personal and professional reputation, mental distress and anguish, she requests actual and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate.

**COUNT III—False Arrest and Unlawful Detention Claim**

89. Plaintiffs realleges and reincorporates all previous paragraphs.

90. As described above, Defendant Officers conspired among themselves and falsely arrested and detained Plaintiff without justification and without probable cause thus violating plaintiff's rights under the Fourth Amendment to the United States Constitution, and 42 U.S.C. Section 1983.

91. Defendants caused Plaintiff Tavares Hamilton to be detained in various state correctional facilities until such time that his case was dismissed favorably to him.

92. Defendants caused Plaintiff Tavares Hamilton to detained even once the case was dismissed due to Defendant Villareal's indictment, for an additional three weeks until the Parole Board reconvened and could make a decision on his parole status.

93. As a result of Defendant Officers' false arrest and unlawful detention, the City's policy and practice, and the Supervisory Defendants' actions and omissions, Plaintiff

suffered emotional injuries including mental and emotional damage and trauma, humiliation, damage to his personal and professional reputation, loss of liberty, mental distress and anguish.

94. WHEREFORE, Plaintiff Tavares Hamilton requests that judgment be entered in his favor and against the Individual Defendants and that he be awarded compensatory and punitive damages, reasonable attorney's fees, costs and expenses and such further relief that this Honorable Court deems just.

**COUNT IV---42 U.S.C. sec. 1983, Due Process Claim**

95. Plaintiff realleges and incorporates by reference the foregoing paragraphs set forth in full herein.

96. The individual Defendants' conduct violated plaintiff's right to due process pursuant to the United States Constitution.

97. Defendant officers conspired amongst themselves to write false police reports and false complaints and to misinform prosecutors of the basis for charges against Hamilton. In so doing, officers withheld exculpatory evidence and instituted criminal proceedings against Hamilton without a lawful basis, in violation of Hamilton's due process rights.

98. As a result of the ongoing false statements and false testimony, Hamilton was deprived of his liberty. This deprivation continued as the result of a parole hold which occurred as a direct result of Defendant's false reports, false sworn statements and false testimony.

99. As a result of Defendant Officers' violation of Tavares Hamilton's constitutional right to due process, the City's policy and practice, and the Supervisory Defendants'

actions and omissions, Plaintiff suffered emotional injuries including mental and emotional damage and trauma, humiliation, loss wages damage to his personal and professional reputation, loss of liberty, mental distress and anguish.

100. WHEREFORE, Tavares Hamilton requests that judgment be entered in his favor and against the individual Defendants and that he be awarded compensatory and punitive damages, reasonable attorney's fees, costs, and expenses and such further relief as this Court deems just.

## COUNT V—State Claim False Imprisonment

101. Plaintiff incorporates and realleges all previous paragraphs.

102. The Defendant Officers restrained and arrested Tavares against his will.

103. The Defendants caused Tavares Hamilton to be seized, arrested and imprisoned despite Defendant Officers' knowledge that there existed no probable cause to arrest him or institute charges against him.

104. Defendant Officers false imprisonment of Tavares Hamilton lasted a total of approximately six months.

105. The Possession with the Intent to deliver drugs charge was dismissed *nolle prosequi* by the State on October 13, 2006, after the indictment of Frank Villareal and other SOS officers.

106. Plaintiff was injured, including emotional and physical damage, lost wages, legal fees, traumas, humiliation, loss of liberty, lost wages, mental distress and anguish.

107. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding damages, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

**COUNT VI—State Claim Assault**

108. Plaintiff realleges and incorporates by reference all of the allegations in the preceding paragraph.

109. The Defendant Officers intentionally created an apprehension of immediate physical harm by approaching Tavares, grabbing him, and throwing him against the fence.

110. These overt gestures created a reasonable fear in Tavares Hamilton and resulted in obvious harmful touching.

111. These actions were objectively unreasonable and were undertaken intentionally with malice, willfulness and reckless indifference to Tavares's rights.

112. As a result of the Defendant Officers conduct, Plaintiff Tavares Hamilton sustained both physical and emotional injuries.

113. WHEREFORE, Tavares demands judgment against Defendant Officers for actual and compensatory damages in an amount deemed at time of trial to be fair and just, as well as reasonable attorneys' fees and legal costs.

**COUNT VII—State Claim Assault—Mary Hamilton**

114. Plaintiff Mary Hamilton realleges and reincorporates all previous paragraphs.

115. Defendants intentionally created a reasonable apprehension of physical harm to Mary Hamilton when they busted through the security chain on the front door or her

home, by ramming through the door she was directly behind, in an attempt to unlawfully enter her family residence to conduct an unconstitutional search.

116. These overt gestures created a reasonable fear in Mary Hamilton and resulted in harmful touching with her person.

117. These actions were objectively unreasonable and were undertaken intentionally with malice, willfulness and reckless indifference to Tavares's rights.

118. As a result of the Defendant Officers conduct, Plaintiff sustained both physical and emotional injuries.

119. WHEREFORE, Mary Hamilton demands judgment against Defendant Officers for actual and compensatory damages in an amount deemed at time of trial to be fair and just, as well as reasonable attorneys' fees and legal costs.

## COUNT VIII—State Claim Malicious Prosecution

120. Plaintiff incorporates and realleges all previous paragraphs.

121. The Defendant Officers knowingly and maliciously caused criminal charges to be filed and prosecuted against Tavares Hamilton.

122. There was no probable cause for the institution of a criminal charge against Tavares Hamilton.

123. The criminal proceedings were commenced and continued maliciously.

124. The Defendant Officers facilitated this malicious prosecution by creating false police reports, which they knew to be false.

125. Defendant Officers swore out false criminal complaints, which they knew to be false, which resulted in charges being brought against Tavares Hamilton.

126. Defendant Officer Villareal gave false and perjured testimony under oath at Tavares Hamilton's probable cause hearing, which he knew to be false, which led to the Court's finding of probable cause for the charges to be brought against him.

127. Plaintiff was wrongfully incarcerated as a direct result of the prosecution of this criminal charge.

128. Defendant Officers continued to misinform Prosecutors causing the criminal charges against Tavares Hamilton to be continued.

129. The false narcotics charges were dismissed *nolle prosequi* on October 13, 2006.

130. Tavares was injured, including emotional and physical damage, lost wages, loss of livelihood, legal fees, traumas, humiliation, loss of liberty, mental distress and anguish.

131. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding damages, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

**COUNT IX—State Claim Intentional Infliction of Emotional Distress—Tavares Hamilton**

132. Plaintiffs re-alleges and incorporates by reference all of the allegations in the preceding paragraphs.

133. The acts and conduct of Defendant Officers as set forth above were extreme and outrageous.

134. Particularly, the conduct of Defendant Officers in driving Tavares Hamilton to his grandmother, Mary Hamilton's home to watch as Officers busted her down in with her standing behind it, was reasonably calculated to cause immense emotional distress to Plaintiff Tavares Hamilton.

135. Defendant Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs.

136. Defendant Officer's conduct was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiffs.

137. Said actions and conduct did directly and proximately cause Plaintiffs to suffer various severe emotional and physical problems.

138. Said actions and conduct caused Tavares Hamilton extensive grief and suffering, in that, due to his incarceration he missed the birth of his child as well as the death of his grandmother.

139. As a result of the emotional distress, Hamilton experienced unusual weight loss of approximately fifty (50) pounds from the time he was arrested until the time he was released.

140. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding damages, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

**COUNT X—State Claim Intentional Infliction of Emotional Distress—Mary Hamilton**

141. Plaintiffs re-alleges and incorporates by reference all of the allegations in the preceding paragraphs.

142. The actions and conduct of Defendant Officers against Mary Hamilton in breaking her door down on her with the security chain engaged in order to conduct an illegal search of her home were extreme and outrageous.

143. Defendant Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mary Hamilton.

144. Defendant Officer's conduct was undertaken with malice, willfulness, and reckless indifference to the rights of Mary Hamilton.

145. Said actions and conduct did directly and proximately cause Mary Hamilton to suffer various severe emotional and physical problems.

146. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding damages, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

**COUNT XII—Unlawful Search and Seizure—Celynthia Smith**

147. Plaintiff realleges and reincorporates all previous paragraphs.

148. As described above, the Defendant Officers, acting under color of law, illegally seized Plaintiff Celynthia Smith's vehicle and caused it to be impounded and never to date be returned to her.

149. More specifically, when Defendant Officers conducted the initial illegal search of Tavares Hamilton, they found the keys to Plaintiff Smith's car in his pocket.

150. Officers destroyed the interior of Celynthia Smith's leased vehicle during the course of multiple searches with revealed no evidence or even the slightest indicia that the car was being used for any illegal purpose.

151. The misconduct described in this Count, particularly the designation of Smith's vehicle as a narcotics vehicle in impounding it was undertaken with malice, willfulness, and reckless indifference to the rights and innocence of Celynthia Smith.

152. Plaintiff Smith continues to be damaged both by the difficulties associated with having small children without her means of transportation, the car being repossessed by the leaseholder because it had been charged by Defendant Officers as being involved in the sale of narcotics, having to pay approximately $1200.00 in fines and fees to avoid her driver's license being suspended, and having her wages garnished for the remaining balance owed on the car at a rate that creates a hardship for her family.

153. The misconduct described in this Count was caused and participated in by Defendants Cline, Morris and Kirby (Supervisory Defendants) in the manner described more fully above.

154.

155. As a result of Defendant Officers' unconstitutional search and seizure of Plaintiff Smith's property, the City's policy and practice, and the Supervisory Defendants' actions and omissions, Plaintiff suffered emotional injuries including mental and emotional damage and trauma, embarrassment and humiliation, damage to her personal and professional reputation, mental distress and anguish.

156. WHEREFORE, Plaintiff Smith requests actual, punitive and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate as well as any other relief that this Honorable Court deems just.

**COUNT XIII—State Claim Intentional Infliction of Emotional Distress—Celynthia Smith**

157. Plaintiff Celynthia Smith realleges and reincorporates all previous paragraphs.

158. The above conduct of Defendants, was extreme and outrageous.

159. More specifically, the Defendant Officers unlawfully seized Smith's vehicle, and designated it for a special impoundment for vehicles used in the sale of narcotics, which the Defendant Officers knew to be untrue.

160. Plaintiff Smith has never regained possession or use of the vehicle and although she paid the impound fees and fines, she was unable to retrieve it from the yard, although she continues to pay the remaining balance for the vehicle.

161. Plaintiff Smith was forced by the conduct of the Defendants, and their various blatant constitutional violations against Tavares Hamilton and ensuing incarceration period, to spend the latter part of her pregnancy and the experience the birth of their youngest child alone while experiencing stress-related problems and conditions from the situation.

162. Defendant Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Celynthia Smith.

163. Defendant Officer's conduct was undertaken with malice, willfulness, and reckless indifference to the rights of Celynthia Smith.

164. Said actions and conduct did directly and proximately cause Celynthia Smith to suffer various severe emotional and physical problems, as well as unnecessary stress during her pregnancy.

165. WHEREFORE, Plaintiff Celynthia Smith demands judgment against Defendant Officers for actual, punitive and compensatory damages in an amount deemed at time of trial to be just, fair and appropriate, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

**COUNT XIV—42 U.S.C. Section 1983 *Monell* Claim**

166. Plaintiffs reallege and incorporate all of the allegations in the preceding paragraphs.

167. The actions of the individual defendants as alleged above were done pursuant to one or more *de facto* policies, practices and/or customs of the City of Chicago, Chicago Police Department, the CPD's Office of Professional Standards, and the CPD's Internal Affairs Division.

168. Among the de facto policies of the municipality and its agents were:

**a.** The failure to properly investigation allegations of police misconduct.

**b.** The failure to have a system which monitors patterns of alleged police misconduct.

**c.** The failure to properly discipline sustained allegations of police misconduct.

**d.** The failure to properly maintain records of police misconduct and allegations of police misconduct, including the use of excessive force and false arrest.

**e.** The failure to properly hire, train, monitor, and/or supervise officers.

**f.** A *de facto* policy, practice, and custom of the police code of silence results in police officers refusing to report instances of police misconduct

of which they are aware, including the use of excessive force and the maltreatment of prsons, despite their obligation under Department regulations to do so. This conduct included police officers who remain silent or give false or misleading information during official investigations in order to protect themselves or fellow officers from internal discipline or retaliation, civil liability, or criminal prosecution.

169. The aforementioned policies, practices, and customs, individually and collectively have been maintained and/or implemented with deliberate indifference by the Defendant City of Chicago, Defendant Police Superintendent Cline, Defendant Office of Professional Standards Administrator Tisa Morris, and Defendant Head of Internal Affairs Division Debra Kirby, and have encouraged the individual Defendants to commit the aforesaid wrongful acts against plaintiffs, and therefore acted as a direct and proximate cause of the complained of Constitutional and other legal violations, and Plaintiff's injuries.

170. WHEREFORE, Plaintiffs request that judgment be entered in favor of Plaintiffs and against Defendant City of Chicago, and that the Plaintiffs be awarded compensatory damages, reasonable attorney's fees, costs, expenses and any other relief that this Honorable Court finds appropriate and just.

**COUNT XIV—State Claim Respondent Superior**

171. Plaintiffs reallege and incorporate all of the allegations in the preceding paragraphs.

172. In committing the acts alleged, Defendant Officers were members and agents of the Chicago Police Department, acting at all relevant times within the scope of their employment.

173. Defendant City of Chicago is the employer of the Defendant Officers.

174. In Illinois, public entities are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 735 ILCS 10/9-102.

175. As a proximate cause of Defendant Officer's unlawful acts, which occurred within the scope of their employment activities, Plaintiff suffered physical and emotional injuries.

176. WHEREFORE, Plaintiffs demand judgment against Defendants City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully Submitted,

Brendan Shiller

Law Office of Brendan Shiller, LLC
36 S. Wabash, Suite 1310
Chicago, IL 60603
312-332-6462
ARDC: 6279789

Jon Erickson

Erickson & Oppenheimer
1051 W. Belmont
Chicago, IL 60657
773-875-4646
ARDC: 6205277